IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

HEIDI JO CAMP                              )
                                           )
v.                                         )     No. 2:13-0034
                                           )     Judge Nixon/Bryant
SOCIAL SECURITY ADMINISTRATION             )


To:     The Honorable John T. Nixon, Senior Judge


## REPORT AND RECOMMENDATION

        This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c), to

obtain judicial review of the final decision of the Social Security Administration ("SSA" or

"the Administration") denying plaintiff's applications for disability insurance benefits and

supplemental security income, as provided under Titles II and XVI of the Social Security Act.

The case is currently pending on plaintiff's motion for judgment on the administrative record

(Docket Entry No. 16), to which defendant has responded (Docket Entry No. 19).  Upon

consideration of these papers and the transcript of the administrative record (Docket Entry

No. 12),[1] and for the reasons given below, the undersigned recommends that plaintiff's

motion for judgment be DENIED and that the decision of the SSA be AFFIRMED.


## I.  Introduction

        Plaintiff filed her applications for benefits in August 2007, alleging disability

onset as of July 18, 2006.  (Tr. 40, 146, 149)  Her applications were denied at the initial and

---

[1]Referenced hereinafter by page number(s) following the abbreviation "Tr."

reconsideration stages of state agency review.  Plaintiff subsequently requested *de novo* review of her case by an Administrative Law Judge (ALJ).  The case came to be heard by the ALJ on October 5, 2009, when plaintiff appeared with counsel and gave testimony.  (Tr. 64-82)  Testimony was also received from an impartial vocational expert.  At the conclusion of the hearing, the ALJ took the matter under advisement until December 15, 2009, when he issued a written decision finding plaintiff not disabled.  (Tr. 40-48)  That decision contains the following enumerated findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

2.  The claimant has not engaged in substantial gainful activity since July 18, 2006, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairments:  a bipolar disorder with depression, anxiety and a history of substance addiction disorder (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has no exertional limitations.  In addition, the claimant is unable to work with frequent contact with the general public, and can learn, carry out and understand only simple job instructions.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on June 1, 1970 and was 36 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      The claimant has no skills that would transfer to other work and transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from July 18, 2006 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 42-44, 46-48)

On March 23, 2011, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 8-10), thereby rendering that decision the final decision of the Administration. After an extension of time following plaintiff's engagement of current counsel on May 5, 2011, this civil action was timely filed, and the court has jurisdiction. 42 U.S.C. §§ 405(g), 1383(c). If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive. Id.

## II. Review of the Record

The parties' briefs offer differing interpretations of the medical record in this case. The records of primary concern are the notes of plaintiff's mental health treatment

from July 2006 to September 2009 at LifeCare Family Services. (Tr. 338-59, 418-33, 470-88, 490-502) Those notes are discussed in some detail in the Conclusions of Law, below. The statement of facts contained in defendant's brief (Docket Entry No. 19 at 2-5) is reproduced her for background purposes:

A. Introduction

The Plaintiff was 39 years old at the time of the ALJ's decision. She is a high school graduate and she has training in culinary arts (Tr. 184). She worked in a variety of jobs, including cook, deli worker, cashier, substitute teacher, cake decorator, and doing sewing (Tr. 178, 189). She last worked in 2007 (Tr. 65). She was laid off from work along with other people, according to the record (Tr. 178, 348).

B. The Medical Evidence

The Plaintiff was admitted to the hospital in September 1991 for a drug overdose. She used alcohol, Valium, marijuana, cocaine, and LSD (Tr. 271-273 ). In July 2006, she went to the hospital because she was depressed and suicidal (Tr. 338-339). She had some auditory hallucinations but was better on medication (Tr. 340-342). In November, she was "overall good" (Tr. 345). In December, she had a fear of returning to work and facing people. People were being laid off at work (Tr. 346). Her therapist encouraged her to apply for disability.

In May 2007, the Plaintiff enjoyed a trip to visit relatives and discussed planning another trip (Tr. 353). In June, she was stable (Tr. 356). In July, she had a good trip to Ohio. She also complained of anxiety attacks (Tr. 357). In August, she was "doing ok" (Tr. 359).

An initial interview of the Plaintiff at Lifecare Family Services in September 2007 revealed that the Plaintiff reported symptoms of mood swings and of depersonalization (Tr. 418-420). She called herself "Phil" and acted as him. She had done that since 1995. She also reported auditory and visual hallucinations, delusions, paranoia, and panic attacks. She was diagnosed with dipolar disorder, with psychotic features; depersonalization disorder;[2] dissociative

_____

[2]"Depersonalization disorder occurs when you persistently or repeatedly have a sense that things around you aren't real, or when you have the feeling that you're observing yourself from outside your body. Feelings of depersonalization can be very disturbing and may feel like you're losing your grip on reality or living in a dream. Many people have a passing experience of

identity disorder;[3] and trichotillomania.[4] Later that day, she was doing better (Tr. 422). She said she felt better and could do her housework.

In October 2007, the Plaintiff was "doing ok". She was euthymic. Her thought content was normal (Tr. 424). She said medication "really helped". Also in October 2007, Dr. Meneese completed a psychiatric review form and a mental residual functional capacity (RFC) assessment. He said that the Plaintiff had depression, bipolar disorder, depersonalization, and trichotillomania (Tr. 398). She had some moderate limitations, he concluded (Tr. 405, 409-410). She could do simple tasks, he stated (Tr. 411).

In November 2007, the Plaintiff said medication was working well. She was euthymic and her thought content was normal (Tr. 428). In February 2008, she had hallucinations and paranoia. However, she was euthymic (Tr. 430). In March, she had less paranoia on a new medication. She was euthymic and her thought content was normal (Tr. 431). She was happy with her current medications (Tr. 432).

In April 2008, Mr. Weaver at Lifecare said the Plaintiff had hallucination and dissociations, marked limitations, poor memory, rarely leaves home, and is unemployable (Tr. 414-416). Also in April, Dr. Wright completed a psychiatric review form and a mental RFC assessment. He said the Plaintiff had some moderate limitations (Tr. 445, 449-450). In May, the Plaintiff said she was upset about having to attend a family function. Her family apparently was

---

depersonalization at some point. But when feelings of depersonalization keep occurring, or never completely go away, it's considered depersonalization disorder. Depersonalization disorder is more common in people who've had traumatic experiences". *See* "Depersonalizaion Disorder" at http://www.mayoclinic.com/health/depersonalization/DS01149.

[3]"We all get lost in a good book or movie. But someone with dissociative disorder escapes reality in ways that are involuntary and unhealthy. The symptoms of dissociative disorders — ranging from amnesia to alternate identities — usually develop as a reaction to trauma and help keep difficult memories at bay. Treatment for dissociative disorders may include psychotherapy, hypnosis and medication. Although treating dissociative disorders can be difficult, many people with dissociative disorders are able to learn new ways of coping and lead healthy, productive lives". *See* "Dissociative Disorders" at http://www.mayoclinic.com/health/dissociative-disorders/DS00574.

[4]"Trichotillomania (trik-o-til-o-MAY-ne-uh) is an irresistible urge to pull out hair from your scalp, eyebrows or other areas of your body. Hair pulling from the scalp often leaves patchy bald spots, which people with trichotillomania may go to great lengths to disguise. For some people, trichotillomania may be mild and generally manageable. For others, the urge to pull hair is overwhelming and can be accompanied by considerable distress. Some treatment options have helped many people reduce their hair pulling or stop entirely". *See* "Trichotillomania (hair-pulling disorder)" at http://www.mayoclinic.com/health/trichotillomania/DS00895.

critical of her for seeking mental health treatment (Tr. 488-489). In June, she was happy with her medication. Her mood was good and she was smiling (Tr. 487).

In October 2008, the Plaintiff had increased hallucinations and paranoia (Tr. 483). In November, she had increased anxiety and depression (Tr. 482). In February 2009, she had diabetes. Her mood was better. She felt happy and peaceful (Tr. 479). In March she liked group therapy (Tr. 478). In April, her mood was stable (Tr. 477). In June, her mood was stable. She was going to Ohio to visit relatives (Tr. 474).

In August 2009, the Plaintiff was not doing well. She had gone to Ohio for a month but a cousin stole her Xanax, she said (Tr. 472-473). In September, she was unable to pay for Effexor and was given samples of Pristiq (Tr. 470-471).[5] She no longer had TennCare.

An evaluation by Mr. Cooper in August reported that the Plaintiff had no restrictions. She could lift up to 100 pounds and sit, stand, and walk for 8 hours (Tr. 464). She could go shopping and travel without needing a companion (Tr. 469).

Evaluations by Linda Ashburn and Mr. Weaver in September 2009 reported marked and even extreme limitations (Tr. 503-508). Ms. Ashburn said the Plaintiff had a male persona in order to dissociate from stressors (Tr. 504). In October, the Plaintiff had visual hallucinations (Tr. 509).


III.  Conclusions of Law

A.  Standard of Review

This court reviews the final decision of the SSA to determine whether that

agency's findings of fact are supported by substantial evidence in the record and whether the

---

[5]"Effexor (venlafaxine) is an antidepressant in a group of drugs called selective serotonin and norepinephrine reuptake inhibitors (SSNRIs). Venlafaxine affects chemicals in the brain that may become unbalanced and cause depression. Effexor is used to treat major depressive disorder, anxiety, and panic disorder". *See* "What is Effexor" at http://www.drugs.com/effexor.html. "Pristiq (desvenlafaxine) is an antidepressant in a group of drugs called selective serotonin and norepinephrine reuptake inhibitors (SNRIs). Desvenlafaxine affects chemicals in the brain that may become unbalanced and cause depression. Pristiq is used to treat major depressive disorder". *See* "Pristiq" at http://www.drugs.com/search.php?searchterm=pristiq.

correct legal standards were applied.  Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d

124, 125 (6th Cir. 2003).  "Substantial evidence is defined as 'more than a scintilla of evidence

but less than a preponderance; it is such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion.'"  Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th

Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir.

1994)).  Even if the record contains substantial evidence that could have supported an

opposite conclusion, the SSA's decision must stand if substantial evidence supports the

conclusion reached.  E.g., Longworth v. Comm'r of Soc. Sec., 402 F.3d 591, 595 (6th Cir.

2005).  Accordingly, while this court considers the record as a whole in determining whether

the SSA's decision is substantially supported, it may not review the case de novo, resolve

conflicts in the evidence, or decide questions of credibility.  See Bass v. McMahon, 499 F.3d

506, 509 (6th Cir. 2007); Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984).

### B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits

by proving his or her "inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than

12 months."  42 U.S.C. § 423(d)(1)(A).  The claimant's "physical or mental impairment" must

"result[] from anatomical, physiological, or psychological abnormalities which are

demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  Id. at §

423(d)(3).  In proceedings before the SSA, the claimant's case is considered under a five-step

sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

1) A claimant who is engaging in substantial gainful activity will not be found

to be disabled regardless of medical findings.

2) A claimant who does not have a severe impairment will not be found to be disabled.

3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.

4) A claimant who can perform work that he has done in the past will not be found to be disabled.

5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony. See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4

(S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

### C. Plaintiff's Statement of Errors

Plaintiff first argues that the ALJ erred in his application of the treating physician rule, in that the opinion letter (Tr. 414-17) and two medical source statements (Tr. 503-05, 506-08) from plaintiff's treatment team at LifeCare were consistent with each other and uncontradicted by other medical evidence, and therefore should have been given controlling weight under 20 C.F.R. § 404.1527(c)(2). However, in order to be entitled to "controlling weight" under the regulations, the opinion in question must be from a "treating source," id., which must in turn be an "acceptable medical source" such as a medical doctor or psychologist. 20 C.F.R. §§ 404.1502, 404.1513(a). Therefore, to judge compliance with the treating source rule, it must first be determined if the opinions in question were rendered by treating sources. Cole v. Astrue, 661 F.3d 931, 938 (6th Cir. 2011). The undersigned finds that they were not. Of the three co-signors to the April 16, 2008 opinion letter, only psychiatrist Dr. Cynthia Rector is an acceptable medical source; Ms. Angela Wentworth is an advanced practice registered nurse, and Mr. Thomas Weaver is a licensed professional counselor. Dr. Rector, the Medical Director of LifeCare, does not appear to have established a treatment relationship with plaintiff, as her name does not appear on any of the Lifecare

treatment notes. Likewise, Ms. Linda Ashburn, M.A., the Intensive Outpatient Program Coordinator at LifeCare who along with Mr. Weaver gave a medical source statement of plaintiff's work-related mental limitations (Tr. 503-05), is not an acceptable medical source under the regulations. The opinions from these sources are properly considered "other source" evidence pursuant to 20 C.F.R. § 404.1513(d)(1) and SSR 06-3p, and the ALJ thus could not have erred in failing to give them controlling weight under the treating source rule. See Cole, 661 F.3d at 939 & n.4.[6]

In any event, the undersigned finds that the ALJ gave sufficient reasons for discounting the weight of the opinions from plaintiff's treatment team at LifeCare. As to the opinion letter, the ALJ found as follows:

> [T]he undersigned only gives this opinion little weight as it is inconsistent with the objective mental evidence of record, the claimant's own statements regarding her abilities and the fact that the claimant previously worked on a regular basis despite her history of all of these symptoms. For example, according to the team, the claimant only ventured into public in the company of family members which is specifically contradicted by the claimant's own admissions that she travels to her children's school and shops alone. Further, on March 19, 2008, the claimant's most recent visit to LifeCare prior to this opinion, the claimant had appropriate grooming and behavior. Her attitude was attentive, her mood was euthymic and her affect was bland. The claimant had normal thought content and attention and her memory was intact. The examiner on that date further found the claimant had a GAF of 51, indicating

---

[6]"The agency's regulations limit treating sources to 'acceptable medical sources,' 20 C.F.R. § 404.1502, the definition of which does not include mental health counselors such as Ms. Dailey, 20 C.F.R. § 404.1513(a). However, Ms. Dailey is an 'other source,' 20 C.F.R. § 404.1513(d)(1), who is entitled to consideration due to her expertise and long-term relationship with Cole. [4]Mr. Cole's situation is not unique; many unemployed disability applicants receive treatment at clinics that render care to low income patients by providing mental health treatment through such counselors. The practical realities of treatment for those seeking disability benefits underscores the importance of addressing the opinion of a mental health counselor as a valid 'other source' providing ongoing care."

a relatively high level of functioning.

(Tr. 45-46)  The ALJ detailed plaintiff's reports of functional ability in her hearing testimony and in response to agency questionnaires, noting that

> ...the claimant also testified that she takes and picks up her children from school on a daily basis and performs household chores.  She further noted that her condition has improved with counseling and mental health treatment.  In addition, on September 7, 2007, the claimant noted that she took her children to school, prepared dinner, did laundry,  packed her children's lunches, fed and watered pets, drove a car, traveled alone, shopped, used a checkbook, counted change, read a book per month and followed written instructions.  Further, on April 3, 2008, the claimant noted that she could watch and follow movies.

(Tr. 44-45)  These "full activities of daily living" and the modest reports of psychiatric symptoms in the LifeCare treatment notes were also cited by the ALJ as reasons to reject the medical source statements of Ms. Ashburn and Mr. Weaver.  (Tr. 46)  While plaintiff argues that the LifeCare treatment notes are consistent with the dire assessments of her mental functioning,[7] the undersigned finds that the ALJ's contrary interpretation of those notes is substantially supported, and not misleading as plaintiff contends.  Those notes reveal that plaintiff struggles with mood swings, but that her treatment team adjusts her medications to combat her periodic increases in psychiatric symptoms, with the result that her mood is

---

[7]Plaintiff also finds support for these assessments in the report of a psychological assessment performed on November 5, 2009, by examiners engaged by her former counsel.  (Docket Entry No. 17 at 8 n.42)  However, as plaintiff notes, this report was submitted in the first instance to the Appeals Council (Tr. 53-61), and was not before the ALJ whose decision is under judicial review here. Accordingly, this Court may not consider the report in these proceedings.  See, e.g., Cotton v. Sullivan, 2 F.3d 692, 696 (6th Cir. 1993).

generally stable and the psychotic and dissociative features of her illness are largely kept at bay. While plaintiff draws the Court's attention to a September 6, 2007 report of her initial diagnostic interview with David Chaney of LifeCare, and the references therein to her symptoms of mood disturbance and depersonalization/dissociation, it appears that these references are largely historical, as her "present illness" on that date was merely noted as "mood swings" (Tr. 420), despite the following narrative report of symptoms:

> . . . [Client] reports the following symptoms of mood disturbance:
>
> with onset ... during her teens ... including: depressed mood/persistent sadness, crying spells daily, anhedonia, decrease[d] appetite, increased sleep, irritability, loss of motivation, indecisiveness, fatigue/loss of energy, loss of self-esteem, low self-esteem, social isolation, inappropriate guilt, difficulty concentrating, poor memory, hopelessness.
>
> Symptoms have been recurrent.
>
> . . .
>
> [Client] also reports the following [symptoms] of depersonalization:
>
> Dressing in bizarre, bright colors - for attention. Calling herself, Phil Zimmerman first in 1995. Wearing a name tag and mustache and eye brows. She wore this while working at the Berkline factory.
>
> While acting as "Phil" she reports being more aggressive - would tell people what she thought about them and more outgoing and loud.
>
> "Phil" did not have any problems with the kids ([Client's] kids) and no emotional problems - very independent.
>
> Sometimes she would wear a cape and at those times she reports getting work done - having fun - and being socially active.

(Tr. 419) Outside of this account, there is only one additional reference in three years of treatment at LifeCare to plaintiff's alter ego: on November 1, 2007, when plaintiff reported an overall benefit from her medication regimen with "a few episodes of feeling detached and

wanting to be Phil." (Tr. 426)  Thus, while plaintiff argues that she has an "inability to handle even minimally stressful situations (without an appearance by 'Phil Zimmerman')" (Docket Entry No. 17 at 23), the record does not support this argument.  Similarly, there is only one reference in the LifeCare notes to plaintiff pulling her hair out.  (Tr. 482)  These stress-induced phenomena therefore appear to have been more prevalent prior to the period for which disability is claimed, during a time in which plaintiff was able to work at jobs which required a degree of skill, as the ALJ noted.  (Tr. 46)  Moreover, the LifeCare records reveal that the psychotic features of plaintiff's bipolar disorder (principally, hallucinations) were generally well managed with the anti-psychotic drugs Risperdal and, in particular, Invega, though dosages of these medications had to be adjusted with some frequency to deal with such symptoms.  (Tr. 341-45, 348-49, 357, 359, 424, 426, 428, 432, 474, 476-77, 479-82, 487)

While plaintiff clearly has an ongoing, significant need for medical and therapeutic mental health treatment, the efficacy of that treatment in relieving her of the brunt of her depressive, dissociative, and psychotic symptoms -- so as to allow a robust range of daily activities which belie the restrictive functional assessments of her treatment providers -- is shown by substantial evidence on the record as a whole.

Plaintiff further claims that the ALJ erred in failing to find her "dissociative personality disorder" to be a severe impairment at step two of the sequential evaluation process, an error which was compounded at the third step of the process when he failed to consider whether she met or equaled the criteria of Listing 12.03 (addressing "Schizophrenic, Paranoid, and Other Psychotic Disorders").  However, prior to plaintiff's revelation of her

alter ego Phil Zimmerman in the September 2007 diagnostic interview, the LifeCare notes only refer in isolated instances to dissociative symptoms which were apparently deemed consistent with her depersonalization disorder, i.e., "feel[ing] separate from her body." (Tr. 340, 346) After that diagnostic interview, the rule-out diagnosis of dissociative identity disorder was given and carried forward until March 2008. (Tr. 420-33) However, consistent with the scarcity of plaintiff's reports of her alter ego, this rule-out diagnosis was not listed in the LifeCare notes beginning in May 2008 (Tr. 471-88), nor given as a diagnosis in the treatment team's opinion letter. (Tr. 414) The undersigned finds no error in the ALJ's failure to consider dissociative personality disorder a severe impairment. Likewise, it appears that the psychotic features of plaintiff's bipolar disorder were appropriately considered by the ALJ at step three, vis-à-vis Listing 12.04 (which considers symptoms such as hallucinations, delusions, and paranoid thinking). See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04. There are no diagnosed psychotic disorders appropriate for consideration under Listing 12.03. Moreover, as discussed above, the record substantially supports the ALJ's finding that any psychotic or dissociative symptoms would be accommodated by the restriction to only simple, unskilled jobs requiring less than frequent contact with the general public.

In sum, though the record in this case might have supported a different conclusion than that reached by the ALJ, it nonetheless contains substantial evidence in support of his decision to deny benefits. That decision must therefore be affirmed.

## IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be DENIED and that the decision of the SSA be AFFIRMED.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 22nd day of December, 2015.


 s/ John S. Bryant

JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE